## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.**

**JANE DOE, individually, and as parent of JOHN DOE 1, and JOHN DOE 2, minors,**

**Plaintiffs,**

**v.**

**THE ALEXANDER DAWSON SCHOOL, L.L.C.**

**Defendant.**

---

## VERIFIED COMPLAINT

---

NOW COME Plaintiffs Jane Doe[1], on her behalf, and on behalf of her minor children, Plaintiffs, John Doe 1 and John Doe 2, and for their Complaint against The Alexander Dawson School, L.L.C., state as follows:

### THE PARTIES

1.      Plaintiff John Doe 1 is a minor individual residing in Boulder County Colorado.

2.      Plaintiff John Doe 2 is a minor individual residing in Boulder County Colorado.

3.      Plaintiff Jane Doe is the mother of John Doe 1 and John Doe 2 and resides in Boulder County Colorado.

4.      James Doe is the father of John Doe 1 and John Doe 2.

---

[1] Plaintiffs seek to file this Complaint and all pleadings under pseudonyms due to the fact that they are minors, the serious and false nature of the allegations against them and the privacy implications to themselves and other non-party minor students referenced herein.  Likewise, Plaintiffs seek the same treatment for their parents, as, if their names are revealed, the minor children's names would be obvious.  Plaintiffs have conferred with counsel for Defendant, who has stated that Defendant does not oppose Plaintiffs proceeding anonymously in this case. Thus, Plaintiffs will file an unopposed motion requesting such a designation.

5.      Defendant The Alexander Dawson School, L.L.C. ("Dawson" or "Dawson School") is a Limited Liability Company organized under the laws of the state of Nevada. Dawson's principle place of business is 6720 Via Austi Parkway, Suite 260, Las Vegas, NV 89119. Dawson is licensed to do business in Colorado and at all times relevant hereto operated a private preparatory school in Boulder County Colorado.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and there is complete diversity between Plaintiffs and Defendant.

7.      Defendant committed the acts complained of herein, in significant part, in the State of Colorado at its Boulder County, Colorado school location.  This Court has in personam jurisdiction over Defendant pursuant to Colorado's Long Arm Statute, Colo. Rev. Stat. 13-1-124.

8.      Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in Colorado. Plaintiffs suffered harm in Colorado that was directly and proximately caused by Defendant's actions as alleged herein. The subject property where the acts of Defendant occurred is located in Boulder County, Colorado.  Most of the parties with knowledge of the facts relating to the incident reside in Colorado.

## GENERAL ALLEGATIONS

9.      John Doe 1 and John Doe 2 are students at the Dawson School's "Upper School" – which serves grades 9-12.

10.     John Doe 1 is a student in the 11th Grade; John Doe 2 is student in the 9th Grade.

11.     John Doe 1 and John Doe 2 have been students at Dawson since kindergarten.

12.     Jane Doe is the mother of John Doe 1 and John Doe 2.

13.     James Doe is the father of John Doe 1 and John Doe 2.

14.     John Doe 1 and John Doe 2 are exemplary students who have been at Dawson for most of their lives.  Their family is a "Dawson family" and the family has invested over $500,000 at Dawson in support of the education and upbringing of the family's three children, and in the Dawson community.  Dawson's actions, as set forth herein, have irreparably harmed John Doe 1, John Doe 2 and their family.

15.     For the Academic Year 2018-2019, Jane Doe and James Doe signed, on behalf of John Doe 1 and John Doe 2, the 2018-19 Re-Enrollment Contract.  Exhibit 1, example of 2018-2019 Re-Enrollment Contract.

16.     The Dawson School sets forth numerous policies and procedures in its "Dawson Upper School Handbook," ("Handbook") which contains agreements by and between Dawson and its Upper School Students.  A copy of the Handbook is attached as Exhibit 2.

17.     In addition to being a separate agreement between Plaintiffs and Defendant, the Dawson Upper School Handbook is incorporated in the Re-Enrollment Contract.  *See*, Exhibit 1, at Paragraph 6.

18.     John Doe 1 and John Doe 2 are two fine young men – young men who exemplify Dawson's behavioral objectives of "*Respect, Compassion, Courage, and Integrity.*"

19.     Exemplifying Dawson's behavioral objectives, John Doe 1, not long ago, helped save the life of a suicidal fellow student.  Accused of plagiarism by Dawson School teacher, Ms. Catherine Fink Johnson, the classmate confided in John Doe 1 that he was contemplating suicide. John Doe 1 immediately informed Jane Doe and Mr. Arnold Lewis, the Dawson Upper School Dean of Students, who took steps to protect the student and ensure his safety.

20.     John Doe 2's leadership, sportsmanship, outstanding academic accomplishments, and respect for his peers and coaches – on and off the athletic field – is a testament to his personal moral compass and integrity.

21.     On the morning of November 6, 2018, in an attempt at political humor on Election Day, John Doe 1 brought to school approximately ten (10) 8"x11.5" print-outs of a widely published, broadly circulated, public internet "meme[2]"depicting conservative columnist and author Ben Shapiro holding a gavel and containing the words "Teleports behind you … prepare to die, liberal."  John Doe 1 believes that the words "Teleports behind you" were cut off or distorted by the printer.  Plaintiffs are not in possession of the meme print-out; an example of the meme is attached as Exhibit 3.

22.     John Doe 1 understood the meme to mean that Ben Shapiro was such an effective conservative theory debater that his arguments would "kill" or "destroy" the arguments of the proponents of liberal theorists.

23.     John Doe 1 and two other students (Student "A" and Student "B") placed approximately eleven of the print-outs around the student center – where students, not teachers congregate.  John Doe 2 did not participate in these activities in any respect, a fact acknowledged by Dawson.  Student A posted one of the print-outs in the Girl's restroom.  The print-outs were placed in areas students would see them and many students laughed at the print-out.

24.     One of the print-outs was placed by Student B outside of Ms. Fink's classroom. The print-out and its contents were not visible from inside the classroom.

---

[2] A "meme" is "a cultural item in the form of an image, video, phrase, etc., that is spread via the Internet and often altered in a creative or humorous way."  https://www.dictionary.com/browse/meme

25.     At some point that morning, just as Ms. Fink's class was to commence, a student presumably told Ms. Fink about the Ben Shapiro print-out posted in the hall outside of her classroom.

26.     Ms. Fink then left her classroom, located the print-out, removed it and alarmed Dawson school officials of the print-out's posting.  Given these facts, it is not believable that any rational adult felt threatened by the print-out.

27.     Nonetheless, around 10:10 a.m., John Doe 2 was abruptly pulled from his structured study hall and taken to Dawson's Head of School ("Headmaster") Mr. George Moore's office where he was questioned about the print-out  by Mr. Moore and Ms. Ann Carson, Dawson's Director of the Upper School.

28.     At approximately 10:45 a.m., John Doe 1 was similarly abruptly pulled from his Advanced Placement ("AP") Chemistry class by Ms. Carson who told him "you know what you've done" and that the school had contacted the authorities.

29.     John Doe 1 was then taken to Mr. Moore's office where he was questioned by Mr. Moore and Ms. Carson.   John Doe 1 answered their questions truthfully, respectfully, apologetically and with remorse.  John Doe 1 made clear to Mr. Moore and Ms. Carson that the Ben Shapiro print-out was meant as joke and expression of political satire and explained that he never meant for this meme to do anything but make his fellow students laugh – which many did. He explained that sharing the meme was not meant to incite violence, fear or anger of any kind but rather was intended as a joke that lay in the "relevance" of the fact that it was Election Day.  Mr. Moore acknowledged this fact and stated that as soon as he learned that John Doe 1 was involved, he knew there was absolutely no threat whatsoever to Dawson or anyone else.  Amongst his peers and teachers, John Doe 1 is widely known for his quick-witted humor.

30.     John Doe 1's school back pack was then painstakingly searched by Mr. Moore who found nothing hazardous, dangerous or threatening.

31.     By his own admission, upon his own investigation, Mr. Moor quickly determined that neither John Doe 1 nor John Doe 2 presented a threat of any kind to Dawson, its students, its faculty or its administrators.

32.     Despite the fact that Mr. Moore had quickly deemed John Doe 1 and John Doe 2 to be of no threat to anyone, John Doe 1 and John Doe 2 were separated from one another and detained.  John Doe 2 was confined to an unattended small utility closet/storage room, and John Doe 1 to a desk.

33.     John Doe 1 was escorted by Mr. Moore, Ms. Carson and Ms. Sarah Amirani (Director of Marketing/Communications) where he was forced to sit at a very public desk and was told to sit there until further notice (which turned out to be over three hours).

34.     John Doe 2 was escorted by Mr. Moore, Ms. Carson, Ms. Amirani and Ms. Hecox to the storage closet where he was locked-in for over three hours without explanation.  At one point, Mr. Moore briefly entered the closet where John Doe 2 was being held and asked John Doe 2 how it felt to be in there - to which he responded that it didn't feel good and that he had no idea why he was shut in a closet.

35.     Both John Doe 1 and John Doe 2 were physically detained against their will by Mr. Moore, were not permitted to leave their confinement for over three hours, and were held without access to water, food, restroom facilities, or the ability to contact their parents.

36.     Around 11:45 a.m., Jane Doe met with Mr. Moore to discuss the matter. Mr. Moore explained to Jane Doe that he knew John Doe 1 and John Doe 2 posed no threat to Dawson, and that he knew this because of his own personal experience with the children over the course of his

tenure as well as their reputations with faculty, teachers, coaches and their peers.  Mr. Moore commented to Jane Doe that boys (including his own son) "do stupid boy things all the time."

37.     During his discussion with Jane Doe, John Doe 1 and John Doe 2, Mr. Moore excused himself stating he had to go check on Ms. Fink who, he told them, was calling an attorney.

38.     Despite having completed his own investigation and concluding that John Doe 1 and John Doe 2 posed no threat whatsoever to the Dawson School, Mr. Moore directed Jane Doe to take the children and to leave the property (at around 2:50 p.m.) and did not permit their return to classes.

39.     At or around the same time, in a disgraceful display of misguided power, Dawson requested the Boulder County Sheriff's Office arrest Student B. Student B was then taken into police custody, arrested and very conspicuously marched out of Dawson's Henderson Hall in handcuffs. It is not known what, if any, action was taken with respect to Student A at that time.

40.     While Jane Doe, John Doe 1 and John Doe 2 remained at Dawson, Mr. Moore proceeded to send a series of emails to the Dawson Community regarding the incident. The first, on November 6th, at 1:45 p.m., wherein Mr. Moore affirmatively stated to the Dawson Community that there was "no threat to the safety of our community;" followed by another at 6:52 p.m. making reference to an "offensive flyer" and, again, affirmatively stating to the Dawson Community that "We were able to ascertain quickly their source and that there was no threat to safety on campus."

41.     On November 7, 2018, at 6:35 p.m., Mr. Moore sent yet another email to the Dawson Community now stating, in part, and in a complete about-face, "there were flyers distributed in Henderson Hall containing threatening, politically-charged language."

42.     Mr. Moore also spoke to the media about the incident and the discipline of the students.  Due to Dawson's egregious mishandling of the situation, the involved students' privacy

rights were violated and the Dawson and Boulder communities quickly came to know the students' identities.

43.     The Dawson Upper School Handbook prohibits Dawson from revealing the details of disciplinary consequences to Dawson students and families.  Exhibit 2, p. 30.

44.     The Dawson Upper School Handbook includes a section on "General Conduct and Discipline."  Exhibit 2, p. 29.  Therein, discipline procedures for failure to adhere to Dawson's standards of conduct are set forth.  The Standards of Conduct section also lists specific actions that constitute "Major Rule Violations" and the violation of which would *possibly* lead to dismissal from Dawson[3]:

- Plagiarism, cheating, or other form of academic dishonesty;

- Willful injury to another person, including harassment and bullying;

- Theft or vandalism of another person's or the school's property;

- Possession or evidence of the use of tobacco, vaping devices, alcohol, drugs, or any other controlled substances;

- False discharge of fire alarms;

- Lying to a school official;

- Flagrant disrespect or foul language directed towards a faculty or staff member;

- Repeated misconduct; or

- Possession of weapons when under school supervision, whether on or off campus.

---

[3] It is important to note that under the GENERAL CONDUCT AND DISCIPLINE section, the paragraph reads:

Dawson requires that its students conduct themselves in the best interest of the community.  The school encourages observance of its virtues as the foundation of a healthy community and expects all of its students to adhere to the following standards of conduct.  **The school understands that people make mistakes and will work with students and families to move the individual and community in a positive direction when mistakes are made**.  That said, a breach of any of the major rules below will result in serious consequences, including the possibility of dismissal from the school… (Emphasis added).

Exhibit 2, p. 29.

45.     The "General Conduct and Discipline" section of the Dawson Upper School Handbook also sets forth a list of "Infractions:"

- Disrespect

- Inappropriate cell phone use

- Dress code violation

- Leaving campus without permission

- Not signing out before leaving campus

- Other violations at the discretion of the faculty member.

Exhibit 2, p. 30.

46.     At no time did Dawson inform Plaintiffs that their alleged actions had violated any of "The Major Rules" or even constituted an "Infraction." Indeed, nothing contained in John Doe 1's or John Doe 2's Dawson School records reflect any notice of a violation, or discipline history with regard to the incident.

47.     Despite this, on November 8, 2018, John Doe 1 and John Doe 2 were called before a hastily convened Dawson Conduct Committee; the Dawson Conduct Committee is convened to address alleged violations of Dawson's "Major Rules"

48.     The Conduct Committee never informed John Doe 1 of the "Major Rule" he allegedly violated.  John Doe 1 selflessly informed the Committee that his younger brother, John Doe 2, had nothing whatsoever to do with the Ben Shapiro print-out.  And, in an emotional exchange, John Doe 1 explained that the worst consequence he could face would be having to leave Dawson.

49.     John Doe 1 has attended Dawson School since Kindergarten and in his 12 ½ years of attendance, he has never had so much as a single "strike" against him. He was a Peer Leader and last year was asked to be a mentor on the 6th Grade "Winterim[4]." John Doe 1 is an Honor Roll student, a Varsity Athlete and recently received the Most Valuable Player ("MVP") award for his success on the Dawson Cross Country team. Consequently he was set to become the Cross Country Team Captain for next season. John Doe 1 was an eighth grade "Peer Leader" for the entire Dawson Middle School and is commonly regarded by his fellow students, the Dawson faculty and administrators as the nicest kid in the High School. John Doe 1 described for the Conduct Committee how important it is to him to graduate from Dawson.

50.     The Conduct Committee never informed John Doe 2 of the "Major Rule" he allegedly violated. John Doe 2 explained to the Conduct Committee that he had no involvement with the print-out, answered each of the Conduct Committee's questions truthfully and frankly; he discussed the matter with dignity and grace - not anger or resentment.

51.     On November 9, 2018, Jane Doe and James Doe met with Mr. Moore. At that meeting, Mr. Moore took a completely different position than he had with Jane Doe on the day of the incident, now taking the position that John Doe 1 bringing the Ben Shapiro print-outs to school posed a threat to Dawson and the Dawson Community - an absurd, calculated and transparent effort to silence any voice that dares express a viewpoint other than those of or otherwise approved by Dawson.

52.     The reality is that Ms. Fink, a very public liberal activist and aspiring politician, seized this opportunity to stifle what she deemed to be "dissenting" young American / Dawson

---

[4] "Winterim is a required, experiential educational program each spring during which regular classes are replaced by a variety of short courses that provide students with educational opportunities not available within the regular curriculum." Exhibit 2, p. 23. John Doe 1 and John Doe 2 have registered for Winterim 2019 and have paid the non-refundable registration fees.

voices and expel the source of the dissent – Mr. Moore and the Dawson School were willing participants in her plan.

53.     In the meeting with the Jane Doe and James Doe, Mr. Moore inexplicably presented two "options": 1) accept Dawson's expulsion of John Doe 1 and John Doe 2, or 2) withdraw both students by 5:00 p.m. that day.  These were not meaningful options and they were presented under extreme emotional and financial duress—truly, a "Hobson's choice."  No rational parent would accept expulsion under the circumstances and Mr. Moore knew it.  Mr. Moore's disingenuous "options," offered near the close of business on a Friday afternoon, were a thinly-veiled and under-handed attempt designed to thwart Dawson's stated and contractually agreed disciplinary appeal process, process to which John Doe 1 and John Doe 2 were due.

54.     The Dawson Upper School Handbook procedure for discipline was not followed by Defendant—in fact, it was blatantly ignored.  Indeed, Mr. Moore unscrupulously circumvented the appeal process, serving as judge, jury and executioner, forcing the withdrawal of John Doe 1 and John Doe 2.  Having no meaningful choice, Jane Doe and James Doe gave notice of John Doe 1's and John Doe 2's withdrawal from Dawson School.

55.     At the same time, an accommodation was reached between Dawson and the Jane Doe and James Doe whereby John Doe 1 and John Doe 2 would be permitted to finish out the remainder of the semester remotely.

56.     However, despite the accommodation to permit John Doe 1 and John Doe 2 to finish the semester, both students have been refused access to their classes via video, audio tape or FaceTime so they could hear or watch what was being taught in those classes.  Instead, they were assigned tedious and senseless projects over the six-week period which are not consistent with

their curriculum coursework and have taught them nothing of significant value. If anything, both students have fallen behind in their coursework.

57.     John Doe 1 and John Doe 2 have now lost over six weeks of valuable schooling and have fallen so far behind that they may not reasonably be able to catch up.  Further, there is great concern that the consequences from losing these weeks of studies will continue into the future, specifically for math and science where missing the foundations that are laid daily in these classes will result in almost certain failure.

58.      Following Dawson's hasty and bad-faith sham disciplinary process, the school planned, convened and conducted multiple assemblies and student gatherings designed to attack and defame John Doe 1's and John Doe 2's (along with Student A's and Student B's) character and reputation in a shamefully self-serving, yet carefully orchestrated, campaign to characterize John Doe 1 and John Doe 2 as threats to Dawson and to justify Dawson's unfounded decision to force their withdrawal.

59.     On November 9th, Mr. Moore sent another email to the Dawson Community where he stated:

> "*three* upper school students produced, distributed, and posted threatening, politically charged flyers in Henderson Hall, including on a teacher's door … I am writing to let you know that, following Dawson's disciplinary process, the families of these students have elected to withdraw them from Dawson." (Emphasis added.)

60.     Not only were Mr. Moore's statements false, they implicitly revealed the identities of the accused, including John Doe 1 and John Doe 2, and exposed the results of the confidential disciplinary process.

61.     While Mr. Moore admitted to Jane Doe and the Dawson Community that John Doe 1's and John Doe 2's actions did not constitute a threat of any kind, he orchestrated and participated

in the character assassination of John Doe 1 and John Doe 2 to prop up a false narrative that the actions of John Doe 1 and John Doe 2 did present a threat in order to justify his actions.

62.     The Dawson Upper School Handbook states:

> Dawson emphasizes four virtues: *respect, compassion, courage, and integrity.* These virtues provide community norms for individual behavior as well as standards for how community members will interact with one another.

The Dawson community, including faculty and students, are expected to adhere to these virtues.

63.     Despite this express standard of conduct, Dawson permitted its current Headmaster to dishonor the reputation of the Dawson community through a poorly orchestrated cover-up of at least one extramarital affair between Headmaster George Moore and at least one parent of Dawson School children.

64.     In one particularly shameful display of the affair at a Dawson Charity event, Headmaster Moore and the parent/donor flaunted their inappropriate touching and flirting before leaving together in his car - to the shock of the parents, donors, board members and the Dawson Community.  The Headmaster's illicit behavior quickly became known to the Dawson Student body.  The Headmaster's conduct, and the lack of consequences for such behavior, did not go unnoticed by Dawson students and set the negative example that engaging in such behavior will not be disciplined or condemned at Dawson.  It is difficult to imagine that the Headmaster's conduct would have met with approval from the Conduct Committee.

65.     Such actions by the Headmaster and Dawson have not only diminished the standard of conduct within the Dawson Community, but have tarnished the reputation and respect for the Dawson School and damaged the value of every Dawson's student's education.

66.     Dawson's Honor Pledge includes the following: "*I will respect the rights and backgrounds of others and be open to diverse points of view.*"  Exhibit 2, p. 3.  Yet, Dawson and

its faculty routinely disrespect the beliefs and viewpoints of others when those beliefs and viewpoints do not coincide with select vocal members of the Dawson faculty and administration.

67.     Dawson, its faculty, and its administrators encourage and promote a singular political and social viewpoint – and silences "nonconforming" viewpoints.  This is clear not only in Dawson's selection of teachers and administrators, but in its tolerance and encouragement of students' bullying other students who dare to express inconsistent views.

68.     Recently, a female Dawson student was targeted, labeled as a racist and bigot, and bullied to tears by classmates for expressing a viewpoint regarding the removal of historical statues - a viewpoint different from the majority of the other students in the class.  In a most cowardly fashion, the teacher did nothing, and Dawson did nothing - flying in the face of Dawson's public pronouncement that it "actively promotes and embraces the exchange of diverse perspectives."

69.     Such blatant political sway at Dawson calls one to question if, in the current situation, the print-out had said "Time to Die Conservative" along with an image of a liberal pundit, would Ms. Fink have reacted in the same hysterical fashion, immediately sought out her own legal representation, and demanded the arrest and expulsions of the students?  The answer is very obviously "NO."

70.     Additionally, a prevalent issue at Dawson is drug abuse and dealing on campus. Yet, despite the School's "strict" policy regarding drugs, Dawson permits drug use and drug dealing to thrive at the School.  It is widely known and accepted that Dawson students use and deal drugs on campus.  Specifically, a particular student was expelled only after "three strikes" for drug-related infractions (despite Dawson's obligation to protect information regarding disciplinary matters involving students, the student's identity and disciplinary history is well known).  *Three strikes* before expulsion despite the School's "strict" tolerance drug policy.

71.     Compare that to John Doe 1 and John Doe 2 - John Doe 1, with not a single strike in twelve and one-half years, and John Doe 2 with a single strike in ten and one-half years - who were forced to withdraw on account of a satirical Ben Shapiro meme print-out.

72.     Yet another example of Dawson's bad faith and unfair application of its standards is that of the degree of punishment applied to the three young men *as well as* one young lady alleged to have been involved in the Ben Shapiro meme incident. The three young men were forcibly removed from class, publicly humiliated and detained against their will for hours - one **arrested, handcuffed**, and "perp-walked" out the school's main entrance by the Sherriff's Office.

73.     The young men were forced to withdraw from Dawson under threat of expulsion and their fate was memorialized by Mr. Moore in a series of emails to the Dawson Community. The young lady involved, on the other hand, faced no such actions, consequences or public humiliation. The reality is that Dawson employs different standards and makes arbitrary and capricious decisions based on financial and politically convenient reasons.

74.     John Doe 1 and John Doe 2 are exemplary students who have been at Dawson for most of their lives.  Their family is "Dawson family." Jane Doe and James Doe have invested over $500,000 at Dawson in support of their three children's education and upbringing, and in the Dawson community.  Dawson's actions have irreparably harmed John Doe 1 and John Doe 2 and their family.

75.     John Doe 1 and John Doe 2 and their family have been, and will be, forced to expend considerable time and resources to repair the damage caused by Dawson.

76.     Plaintiffs have attempted to enroll John Doe 1 and John Doe 2 in new schools.

77.     As a part of that process, on or about December 17, 2018, the Registrar for the Boulder Valley School District ("BVSD") called Dawson to complete the "School Safe" check. Despite the routine nature of this process, Dawson refused to respond to the request.

78.     Indeed, on information and belief, the BVSD Registrar has made numerous unsuccessful attempts to contact Dawson to obtain this information.  On Information and belief, John Doe 1 and John Doe 2 cannot be registered at a BVSD school absent this information from Dawson.

79.     On information and belief, on the afternoon of December 27, 2018, Mr. Moore finally left a message with the individual conducting the School Safe check for BVSD.

80.     On information and belief, Barb Payne in Ms. Carson's office at Dawson handles these requests.  Inexplicably, George Moore has taken over the process from Ms. Carson's office, and refuses to cooperate in a meaningful fashion with BVSD causing immediate and irreparable harm to John Doe 1 and John Doe 2, who were not only forced to leave Dawson, but are now cruelly being held hostage by Dawson.

81.     On information and belief, BVSD's school semester begins on January 8, 2019. For the children to be registered, meet with counselors and obtain a schedule, prior to the beginning of the semester on January 8, 2019, the requested information is needed now.

82.     On December 21, 2018, counsel for Plaintiffs emailed Mr. Moore directly imploring him to cooperate with the BVSD for the benefit of the Plaintiffs.  He did not respond, nor did he provide the information to the BVSD.  As of the filing of this Complaint, Mr. Moore has not provided the necessary information / response to BVSD.

83.     The Dawson School has intentionally complicated the registration process for John Doe 1 and John Doe 2.

## COUNT I
## BREACH OF CONTRACT

84.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth here and further allege as follows:

85.     The Defendant entered into the Re-Enrollment Contracts and the Dawson Upper School Handbook agreement with the Plaintiffs which set forth specific terms regarding, among other things, tuition, academics, standards of conduct of the Dawson Community, and disciplinary procedures.

86.     The Defendant failed to follow the standards and fairly apply the disciplinary procedures set forth in the Re-Enrollment Contract and the Dawson Upper School Handbook.

87.     Defendant failed to provide to Plaintiffs (and all Dawson students) a headmaster that adhered to the Dawson Community norms as adopted by the Dawson School.  The Dawson Upper School Handbook expressly states that:

> To facilitate the work of the community in this area, Dawson emphasizes four virtues: *respect, compassion, courage, and integrity*.  These virtues provide community norms for individual behavior as well as standards for how community members will interact with one another.

As set forth above, Defendant's Headmaster, Mr. Moore, has not conducted himself with respect and integrity as called for by the Dawson Upper School Handbook, and thus setting a poor example of conduct standards for Dawson students including Plaintiffs.

88.     Defendant failed to apply the disciplinary standards and process fairly with respect to Plaintiffs John Doe 1 and John Doe 2.  Specifically, Student A, a young female, was treated considerably different that the three young male students allegedly involved in the incident.  The disciplinary procedures and standards of conduct employed for Student A, were unfairly different than those employed for John Doe 1 and John Doe 2 (and Student B).

89. Defendant breached the contracts when it revealed to other Dawson students and families the details of Plaintiffs John Doe 1's and John Doe 2's disciplinary consequences through emails, statements to the press and during school assemblies.

90. The Plaintiffs substantially performed and complied with their contractual promises. Specifically, Plaintiffs have made all required payments for both John Doe 1's and John Does 2's tuition and other items as called for by the contracts. Further, Plaintiffs John Doe 1 and John Doe 2 are exemplary students both academically and behaviorally. In regard to the incident at issue, Plaintiffs fully and honestly participated in the disciplinary process as set forth in the Dawson Upper School Handbook.

91. As a result of Defendant's breaches, Plaintiffs have suffered damages in the form of loss of tuition payments, Winterim payments, and loss of their status as their access to Dawson's academics and athletics.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

92. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth here and further allege as follows:

93. At all times relevant to this action, the Plaintiffs and Defendant were parties to the Re-Enrollment Contracts, and the Dawson Upper School Handbook.

94. Every contract requires the parties to act in good faith and to deal fairly with each other in performing or enforcing the express terms of the contract.

95. The Re-Enrollment Contracts and the Dawson Upper School Handbook's implied covenant of good faith and fair dealing are designed to effectuate the reasonable expectations of the parties thereto.

18

96.     The Dawson Upper School Handbook expressly states that it "articulates our shared beliefs, aspirations, and expectations."  Exhibit 2, p. 1.

97.     It has always been Plaintiff's reasonable expectation that Defendant and its faculty would keep the promises they made in the Re-Enrollment Contracts and the Dawson Upper School Handbook and follow the standards and fairly apply the disciplinary procedures set forth therein.

98.     It has always been Plaintiff's reasonable expectation that Defendant and its faculty would keep the promises they made in the Re-Enrollment Contracts and Dawson Upper School Handbook and follow the standards set forth therein, and conduct themselves honestly, with integrity and not to the detriment of the Dawson School.

99.     Defendant breached the Re-Enrollment Contracts and the Dawson Upper School Handbook's implied covenant of good faith and fair dealing by not fairly applying the disciplinary standards set forth therein, and by not following the disciplinary procedures set forth therein.

100.     Defendant breached the Re-Enrollment Contracts and the Dawson Upper School Handbook's implied covenant of good faith and fair dealing when it forced John Doe 1 and John Doe 2 to withdrawal under threat of expulsion. Defendant's threat of expulsion to force Plaintiffs' withdrawal was in bad faith and was designed to deprive Plaintiffs of the benefit of the contracts.

101.     Defendant breached the Re-Enrollment Contracts and the Dawson Upper School Handbook's implied covenant of good faith and fair dealing when it applied substantially different and harsher disciplinary standards and procedures to John Doe 1 and John Doe 2 as opposed to other students.

102.     Defendant breached the Re-Enrollment Contracts and the Dawson Upper School Handbook's implied covenant of good faith and fair dealing when it did not enforce the standards set forth therein with respect to its Headmaster's conduct.

103.     Plaintiffs have been damaged by Defendant's breach of the Re-Enrollment Contracts and the Dawson Upper School Handbook's implied covenant of good faith and fair dealing in an amount to be determined at trial, in excess of the jurisdictional minimum.

**COUNT III**
**FALSE IMPRISONMENT**

104.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth here and further allege as follows:

105.     The Defendant intended to restrict Plaintiff John Doe 1's and Plaintiff John Doe 2's freedom of movement when it detained them against their will and locked John Doe 2 in a utility closet and confined John Doe 1 to a desk.

106.     The Defendant, directly restricted Plaintiff John Doe 1's and Plaintiff John Doe 2's freedom of movement for over three hours.

107.     Plaintiff John Doe 1 was aware that his freedom of movement was restricted.

108.     Plaintiff John Doe 2 was aware that his freedom of movement was restricted.

109.     Plaintiffs John Doe 1 and John Doe 2 were damaged as a result of Defendant's actions.

**COUNT IV**
**EXTREME AND OUTRAGEOUS CONDUCT**

110.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth here and further allege as follows:

111.     Defendant engaged in extreme and outrageous conduct when it:

    a.   publicly humiliated Plaintiff John Doe 1 and Plaintiff John Doe by pulling them from their respective classes in an aggressive and forceful manner;

    b.   confined Plaintiff John Doe 2 to a small utility closet for over three hours;

c.  confined Plaintiff John Doe 1 to a desk, where his confinement was visible to students and faculty;

d.  threatened expulsion in order to coerce Plaintiffs to voluntarily withdrawal from the Dawson School;

e.  conducted multiple assemblies and events wherein the Plaintiffs were defamed and condemned;

f.  refused to cooperate with the Boulder Valley School District Registrar so that Plaintiffs John Doe 1 and John Doe 2 could enroll in for classes beginning in January 2019.

112.  The Defendant did so recklessly or with the intent of causing the Plaintiffs severe emotional distress.

113.  A series of acts may constitute outrageous conduct, even though any one of the acts might be considered only an isolated unkindness or insult.

114.  All of the acts of Defendant and its faculty, which were under its supervision and control, set forth herein, taken together or in any combination of two or more, constitute a claim against Defendant for extreme and outrageous conduct.

115.  The Defendant's conduct caused the Plaintiffs severe emotional distress which has persisted since the date of the incident and includes fright, grief, shame, humiliation, embarrassment, anger, sorrow, disappointment, and constant state of worry.  The distress suffered by the Plaintiffs is so extreme that no person of ordinary sensibilities could be expected to tolerate and endure it.

WHEREFORE, Plaintiffs respectfully request the Court issue the following relief:

A.  Judgment entered in their favor on all claims;

B.  Order Defendant to reinstate John Doe 1 and John Doe 2 as a matriculating students and to accord them all of the rights, privileges, and access to campus facilities and events of a fully enrolled students;

C.  Issue an order enjoining Defendant from expelling and/or forcing the withdrawal of John Doe 1 and John Doe 2 based on the incident;

D.      Award Plaintiffs costs and reasonable attorneys' fees;

E.      Award other relief as this Court may deem just and proper.

Dated this 28th day of December, 2018

Respectfully submitted,

**LASZLOLAW**

*s/ Michael J. Laszlo*
Theodore E Laszlo, Jr. (#36234)
Michael J. Laszlo (#38206)
2595 Canyon Blvd., Suite 210
Boulder, CO 80302
Telephone: (303) 926-0410
tlaszlo@laszlolaw.com
mlaszlo@laszlolaw.com

Attorneys for the Plaintiffs

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury as to all counts and issues so triable in the above matter.

*s/ Michael J. Laszlo*
Michael J. Laszlo

## VERIFICATION

STATE OF COLORADO ⟩
                       ⟩   ss.
COUNTY OF Boulder ⟩

I hereby swear and affirm, on my behalf and on the behalf of my minor children John Doe 1 and John Doe 2, that:

- I have reviewed the Complaint.

- Regarding the allegations of which I have personal knowledge, I know or believe them to be true.

- Regarding the allegations of which I do not have personal knowledge, I believe them to be true based on specified information, documents, or both.

The foregoing document was acknowledged before me this 28th day of December, 2018, by Anne Wells.

Witness my hand and official seal.

Notary Public

My Commission Expires: May 16th 2021

HEIDI L LUCARELLI
Notary Public – State of Colorado
Notary ID 20134031374
My Commission Expires May 16, 2021